# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### February 9, 2016 Session

## KENNETH R. VAUGHT v. GREEN BANKSHARES, INC., ET AL.

**Appeal from the Chancery Court for Knox County**
**No. 1818482     Clarence E. Pridemore, Jr., Chancellor**

---

### No. E2015-01259-COA-R3-CV-FILED-APRIL 18, 2016

---

This appeal arises from an effort by a former bank employee to collect certain deferred compensation payments. Kenneth R. Vaught ("Vaught") filed a complaint against his former employer, Green Bankshares, Inc., and its wholly owned subsidiary, Greenbank ("Greenbank"), in the Chancery Court for Knox County ("the Trial Court"). Both sides agree Vaught is entitled to certain deferred compensation. The issue is the amount. According to Greenbank, Federal Deposit Insurance Corporation ("FDIC") and Troubled Asset Relief Program ("TARP") regulations prevent payment of the total amount requested by Vaught as it would constitute a prohibited "golden parachute." After a trial, the Trial Court found in favor of Vaught, awarding him the full amount. Greenbank appeals. On appeal, FDIC, *amicus curiae*, argues that the additional deferred compensation payment to Vaught constitutes a prohibited golden parachute. We hold that the Trial Court's judgment places Greenbank in the untenable position of having to either disobey the Trial Court's judgment or flout federal regulations and FDIC. We vacate the judgment of the Trial Court, remand this case to the Trial Court, and order a 60 day stay, during which time Vaught may pursue, should he elect to do so, other avenues of relief, including via the Administrative Procedure Act ("the APA") to challenge FDIC's determination.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Vacated; Case Remanded

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., and THOMAS R. FRIERSON, II, JJ., joined.

Edward H. Trent and Mary M. Helms, Knoxville, Tennessee, for the appellants, Green Bankshares, Inc. and Greenbank.

Craig L. Garrett, Maryville, Tennessee, for the appellee, Kenneth R. Vaught.

Colleen J. Boles, Assistant General Counsel, Kathryn R. Norcross, Senior Counsel, and, Jerome A. Madden, Counsel, Arlington, Virginia, for *amicus curiae* Federal Deposit Insurance Corporation.

**OPINION**

**Background**

This appeal concerns the ramifications of a 2004 Non-Competition Agreement ("the Agreement") Vaught entered into with his then employer, Greenbank. Pursuant to the Agreement, Vaught was entitled to deferred compensation. The Agreement provided that payment under the Agreement was to begin when he turned 50 years old in July 2014 or upon his termination, whichever occurred later, and continue for ten years. The annual benefit upon termination was slated to be $84,924 paid in equal payments over a ten year period resulting in a total of $849,240.

In August 2011, Vaught was terminated as President and Chief Operating Officer of Greenbank. At the time, Greenbank officially was designated as in "troubled condition." This designation had important implications for Vaught's compensation. At the time of Vaught's termination, the amount accrued on the books toward his deferred compensation was $521,497. The essence of this appeal is which total figure Vaught is entitled to: $849,240 over ten years as originally contemplated, or $521,497 over ten years as accrued at the time of his termination. The parties do not dispute that Vaught is entitled to the latter figure. However, Greenbank and FDIC, as *amicus curiae*, contend that, given Greenbank's troubled condition at the time of Vaught's termination, a full payment of $849,240 over ten years would constitute an impermissible golden parachute under applicable TARP and FDIC regulations.

Vaught sued Greenbank in December 2011.[1] Vaught asserted, among other things, that he was entitled to severance and change in control benefit payments. Greenbank filed a motion for summary judgment in opposition. In February 2014, Vaught amended his complaint by seeking declaratory relief regarding the amount he was owed under the Agreement in deferred compensation. In August 2014, the Trial Court granted Greenbank's motion for summary judgment relative to the severance and change in control benefits, concluding they were prohibited golden parachutes under TARP regulations. In May 2015, the issue of deferred compensation was tried. At trial, the Trial Court deemed inadmissible as hearsay an FDIC opinion letter dated May 28, 2014 opining that Vaught was limited to $521,497 and that the additional sum would amount

_____

[1] Vaught also sued North American Financial Holdings and Capital Bank, N.A., but they are not parties to this appeal.

to a prohibited golden parachute. The Trial Court found in favor of Vaught. By June 2015 order, the Trial Court entered its findings and conclusions as follows:

1. In 1998, Kenneth Vaught (hereinafter Plaintiff) was working at First Tennessee Bank in Maryville, Blount County, Tennessee.

2. Plaintiff was recruited by Greenbank (hereinafter Defendant) to come to work for Defendant in 1998 to operate and run two (2) branches of Greenbank in Blount County, Tennessee, then operated as American Fidelity Bank.

3. Over the course of the next twelve (12) months, Plaintiff either recruited or hired approximately twenty-five (25) new employees to come work for him at Greenbank operating the two (2) American Fidelity branches.

4. Plaintiff's original employment contract with Defendant contained both a non-compete provision and also contained a bonus provision to provide for bonuses based on a formula connected to the bottom line profitability of the two (2) American Fidelity branches managed by Plaintiff.

5. Over the next several years the American Fidelity branches managed by Plaintiff were profitable and upon expiration of Plaintiff's existing employment contract, the parties desired to enter into new employment contracts.

6. The parties entered into two (2) new contracts. One contract was the Employment Contract and the other was a Non-Competition Agreement that is the subject of this litigation.

7. The Non-Competition Agreement entered into by the parties and stipulated as Exh. No. 1, provided in paragraph no. 2 that for and in consideration of the deferred compensation benefits granted by the company to the employee under the terms of the agreement that Plaintiff, during the term of his employment and for a period from termination, whether by resignation or otherwise, would not compete with Defendant until his 46th birthday, directly or indirectly. At the time of the execution of the contract, Plaintiff was 40 years old.

8. Paragraph No. 8 of the Non-Competition Agreement titled "Deferred Compensation Benefits", provided that in consideration of the covenants contained therein, that the Defendant agreed to provide deferred compensation benefits to Plaintiff in the amount set forth in Schedule A under the column "Annual Benefit Upon Termination" for the age specified in said schedule upon termination of his employment.

9. Schedule A to the Non-Competition Agreement showed the annual benefit grew each year that Plaintiff remained employed at the bank.

-3-

10. The agreement specifically provided that under no circumstances would Plaintiff receive the first annual benefit payment under the contract until he reached age 50 and, that if Plaintiff's employment was terminated from the bank prior to age 50, his benefit payment would not start until his 50th birthday.

11. The agreement further provided that if Plaintiff chose to remain employed at the bank after reaching age 50 and chose to continue to be bound by the Non-Competition Agreement, then the annual benefit would continue to grow until Plaintiff's 60th birthday at which time payments would begin.

12. The footnote to Schedule A provided that if Plaintiff's termination of his employment occurs after age 50, that payments would commence the month following termination and the annual payments would continue for ten (10) years.

13. The footnote to Schedule A also provided the accrual liability balance is based on accruals required under Generally Accepted Accounting Principals (GAAP) and was based on a plan commencement date of September 1, 2004, the method of calculating interest was a 6.5% discount rate compounded monthly.

14. This Court has previously held that the change of control benefit was barred by the federal TARP regulations. However, the same is not at issue in this present litigation.

15. At the time the Defendant and Plaintiff entered into the Non-Competition Agreement, the Defendant bought two (2) bank owned life insurance policies (BOLI) to fund Plaintiff's non-compete agreement for the $2,500,000.00

16. The BOLI policies were not put into a specific trust for the Plaintiff's contract, but were purchased by the Defendant to fund Plaintiff's Non-Competition Agreement.

17. Defendant has argued that the lower annual benefit of $52,149.70 is mandated by two sets of federal regulations (i.e. TARP and FDIC) because the greater payment of $84,924.00 would constitute a golden parachute under these regulations.

18. There is no dispute that the lower payment of $52,149.70 is deferred compensation which is a clear exception to both the TARP and FDIC regulations prohibiting golden parachutes.

19. Both the TARP and FDIC regulations provide seven (7) requirements for a benefit plan to meet the deferred compensation exclusion. The TARP requirements are listed at 31 CFR 30.01. The FDIC requirements are found at 12 CFR 359.1(d).

-4-

20. It is undisputed that the annual benefit under Plaintiff's Non-Competition Agreement meet the first six (6) requirement of both definitions.

21. The only disputed portion is the seventh requirement which reads as follows: "... and payments pursuant to the plan are not in excess of the accrued liability computed in accordance with GAAP" (TARP definition, 31 CFR 30.1) "...payments pursuant to such plans shall not be in excess of the accrued liability computed in accordance with GAAP" ( FDIC definition CFR 359.1(d)).

22. Neither of the above cited regulations require accrual to stop at termination.

23. The $521,497.00 accrued at the time of Plaintiff's termination in August 2011 was the then present value of the future payments of $84,924 which were to begin upon Plaintiff's 50th birthday in July 2014 and to be payable for a period of ten (10) years.

24. The original accrual schedule set up by the bank and its consultant, Clark Consulting, was prepared pursuant to GAAP and anticipated that accrual would occur until Plaintiff's 50th birthday which was assumed to be when the first payment would begin. This accrual schedule was prepared to GAAP.

25. The bank continued to accrue liability for the annual benefit past Plaintiff's termination and up to the date of his 50th birthday. This continued accrual was done pursuant to GAAP.

26. As of December 31, 2015, the Defendant has accrued $852,743.18 towards Plaintiff's annual benefit.

27. Pursuant to the terms of the Non-Competition Agreement, the benefit did not continue to grow after Plaintiff's termination, but the accrual would have continued up until the date of the first payment on July 2, 2014, such that the accrual as of the date of payment would have been the present value of July 2, 2014, of the annual payments of $84,924 payable over ten (10) years. This is the accrual required by GAAP. The present value of the stream of payments due to Plaintiff was included in the $852,743.18 on the Defendant's books.

28. The annual benefit payment was for and in consideration of the non-compete and was not a severance payment for departure.

29. That the payments met the definition of deferred compensation, which is excluded from the golden parachute definitions.

30. In April 2011, the Defendant was advised by the FDIC in a letter entered as Exh. No. 7, that they were prohibited from paying or agreeing to pay any golden parachute payments without the approval of the FDIC.

31. The Defendant acknowledged receipt of the FDIC's April 2011 letter and stated in the letter stipulated as Exh. No. 11, that Defendant would not pay or agree to pay any golden parachute payment without the approval of the FDIC.

32. In May 2012, Defendant entered into an agreement with North American Financial Holdings/ Capital Bank to be acquired in a merger wherein the acquirer would acquire 90% of the stock of Defendant.

33. The merger of the two banks required the preparation of a Final Proxy Statement that would be voted upon by the Defendant's shareholders.

34. The Final Proxy Statement which was stipulated as Exh. No. 12 is a detailed and comprehensive document that describes in detail the merger transaction along with a detailed section regarding executive compensation of the bank officers.

35. Both sides to the merger process had significant input into the preparation of the proxy documents and the proxy documents were reviewed by law firms for both parties, accountants for both parties and bank officers for both parties.

36. The Final Proxy Statement (Exh. No. 12) provided that if Plaintiff was terminated in 2011, that the annual benefit he was entitled to for ten (10) years would be $84,924. There was no mention in the Final Proxy by Defendant that any portion of this $84,924 was considered to be a golden parachute.

37. Plaintiff was terminated from his employment with Defendant by letter dated August 9, 2011, which was stipulated as Exh. No. 13.

38. Plaintiff's termination letter was signed by bank CEO Stephen Rowand.

39. Plaintiff's termination letter was drafted by the bank's legal counsel Bass, Berry and Sims.

40. The Defendant was aware of FDIC and TARP regulations regarding golden parachute payments at the time of both the Final Proxy Statement and Plaintiff's termination letter.

41. Plaintiff's termination letter concluded that the proper annual benefit was $84,924 and that the same was not a golden parachute, but appropriate deferred compensation and that the Defendant agreed in the termination letter to pay Plaintiff the $84,924 benefit for ten (10) years beginning on his 50th birthday.

42. Plaintiff presented the testimony of James Adams, who was the former CFO of Defendant.

43. This Court found Mr. Adams to be an expert on Generally Accepted Accounting Procedures (GAAP).

44. This Court found Mr. Adams' testimony to be credible and helpful to the Court.

45. The Defendant has failed to present any witnesses to support their position that any payment above $52,149.70 would be considered a golden parachute payment.

46. The Defendant has failed to provide any explanation as to why it has changed its opinion as to Plaintiff's annual benefit amount since the time of the termination letter and the 2011 Final Proxy Statement.

47. The Defendant has provided no testimony that would require the accrual for Plaintiff's annual benefit to cease at the time of his termination in 2011 rather than at the time payments began in July 2014.

48. The current issue before this Court was not part of Plaintiff's original Complaint filed in December 2012.

49. Subsequent to the filing of the December 2012 Complaint, Plaintiff became aware of the Defendant's intention to not pay the full annual benefit of $84,924 and amended his Complaint to add Count V, which is the subject of this current matter before the Court.

50. When the first annual benefit payment became due on Plaintiff's 50th birthday (July 2, 2014), the Defendant made no payment to Plaintiff in any amount.

51. In April 2015, Plaintiff received a check in the mail from the Defendant in the amount of $52,149.70, dated April 16, 2015, which came directly to Plaintiff's home and did not go through Plaintiff's legal counsel. The check did not include any interest for being late.

CONCLUSIONS OF LAW

A. This Court finds that the Annual Benefit Upon Termination under Plaintiff's Non-Competition Agreement is not a golden parachute payment, under either the TARP regulations or the FDIC regulations.

B. This Court has previously ruled that the annual benefit was deferred compensation and not a golden parachute payment under the TARP regulations when it granted Plaintiff's Motion for Summary Judgment on this issue and this Court reiterates and reaffirms that finding.

C. This Court finds that the annual benefit under the Non-Competition Agreement was not paid as a result of Plaintiff's departure or for a change of control but was for work performed and benefits accrued.

D. This Court finds that the consideration for the Non-Competition Agreement was Plaintiff's covenant not to compete and that Plaintiff fully complied with this covenant by not competing with the Defendant until his 46th birthday.

-7-

E. This Court finds that the annual benefit under the Non-Competition Agreement was not for Plaintiff's departure and that the only effect that Plaintiff's termination had on the benefit was to determine the amount to be paid under Schedule A of the Non-Competition Agreement.

F. This Court finds that the annual benefit under the Non-Competition Agreement was not a severance benefit or a termination benefit which would meet the TARP definition of a golden parachute.

G. This Court further finds that the Annual Benefit Upon Termination meets the definition under both TARP and FDIC regulation for *bona fide* deferred compensation, which is an exclusion to the golden parachute under both sets of regulations.

H. This Court finds that the $521,497 accrued on the Defendant's books as of Plaintiff's termination in August 2011 was the then present value of the $84,924 annual benefit payable over ten (10) years beginning July 2, 2015, and this amount was accrued on the Defendant's books according to GAAP which requires and mandates that the Defendant accrue only the present value of a future stream of benefits on its books.

I. This Court finds that the Defendant continued to accrue for Plaintiff's annual benefit upon termination and this continued accrual was pursuant to GAAP which requires and mandates that a bank or other entity accrue to the full eligibility date which this Court finds to be July 2, 2014 (Plaintiff's 50th birthday). This Court further finds that neither the TARP regulations or the FDIC regulations require under their definition of deferred compensation that the Defendant stop accruing for deferred compensation at the time of the employee's termination unless the employee's benefits begin at termination. Plaintiff's benefits did not begin at termination but began later upon his 50th birthday.

J. This Court finds that the annual benefit payment in [sic] not limited to the $521,497 accrued on the Defendant's books in August 2011 because this amount was merely the present value of the future stream of benefits to begin in July 2014.

K. This Court finds that since the $521,497 was the present value in August 2011 of $84,924 annually, beginning in July 2014, then the payments of $84,924 annually for ten (10) years beginning in July 2014 would not be in excess of the amount accrued on the Defendant's books and would not be contrary to either the TARP or FDIC definition of deferred compensation.

L. This Court finds that as of the date of the first payment due Plaintiff on July 2, 2014, the bank had fully accrued on its book the present value of the ten (10) year payment stream that Plaintiff was to receive in the amount of $84,924 and as such, the payment of the annual benefit in that

amount would not exceed the accrued liability on the Defendant's books as of that date.

M. This Court finds that the accrual of liability per GAAP is merely an account entry recognizing a liability on the books of the bank.

N. This Court finds that by continuing to accrue for the liability after Plaintiff's termination, that the Defendant did not increase the actual benefit amount but only increased the liability accrual up until the payments began.

O. This Court finds that accrual under GAAP is based upon and considers the time value of money.

P. This Court finds that both TARP and FDIC regulations recognize the time value of money, by requiring accrual pursuant to GAAP.

Q. This Court finds that the Plaintiff is entitled to the annual benefit of $84,924 which payments were to begin on July 2, 2014, and be paid annually for a period of ten (10) years.

R. This Court finds that the declaratory judgment statutes of the State of Tennessee allow and require the court to give complete relief in conjunction with a ruling for declaratory relief.

S. This Court finds that Plaintiff is entitled to prejudgment interest from July 2, 2014, forward at a rate of 5.25%.

T. This Court finds that the Plaintiff is entitled to pre-judgment interest on the difference between the $84,924 payment due and the $52,149.70 payment received, which is a difference of $32,774.30 at a rate of 5.25% from April 16, 2015, until the date declaratory judgment is entered. Thereafter, judgment interest would accrue per statute.

U. This Court finds that Plaintiff shall have a monetary judgment against the Defendant for $32,774.30, along with pre-judgment interest as set forth above, for which execution may issue. Plaintiff shall prepare said money judgment.

V. This Court finds that Plaintiff is entitled to future annual payments of $84,924 payable for nine (9) more years, with the next payment being due on July 2, 2015, and July 2nd of each year thereafter.

W. This Court orders that in the event payment is not made by the Defendant on July 2nd of each year, and if the Plaintiff files an affidavit with the Court to that effect after the due date, that the Plaintiff shall be allowed to submit a monetary judgment with his affidavit for that year's annual payment plus statutory interest for the time that the same is not paid and the Court will grant judgment for which execution may issue.

X. The cost associated with this cause are taxed to the Defendant Greenbank, for which execution may issue.

In July 2015, the Trial Court entered its final judgment, stating:

This matter came before the Court for trial on Count V of Plaintiff, Kenneth R. Vaught's Amended Complaint. Previously, the Court granted Defendants, Green Bankshares, Inc. and GreenBank's Motion for Summary Judgment as to Counts I, III, and IV of the Amended Complaint. Based on this Court's August 20, 2014 Order, as clarified by Order dated October 22, 2014, and based on this Court's June 11, 2015 Findings of Facts and Conclusion of Law and Order following trial on Count V, the Court enters this Final Judgment pursuant to Rule 54.02, Tenn. R. Civ. P. as to all claims filed by Plaintiff against Defendants Green Bankshares, Inc. and GreenBank finding that there is no reason to delay entry of judgment on these claims, which involve all issues between these parties.

Accordingly, it is now

ORDERED AND ADJUGED:

1. Based on the Court's June 11, 2015 Findings of Facts and Conclusion of Law and Order, above Findings of Fact and Conclusions of Law, the Court enters judgment in favor of Plaintiff, Kenneth R. Vaught as to Count V of the Amended Complaint seeking Declaratory Judgment regarding the amount of the "Annual Benefit Upon Termination" to which he is entitled under his 2004 Non-Competition Agreement as follows:

a. Plaintiff is entitled to the annual benefit of $84,924, which payments were to begin on July 2, 2014, and be paid annually for a period of ten (10) years.

b. The declaratory judgment statutes of the State of Tennessee allow and require the Court to give complete relief in conjunction with a ruling for declaratory relief.

c. Plaintiff is entitled to prejudgment interest from July 2, 2014, forward at a rate of 5.25%.

d. Plaintiff is entitled to pre-judgment interest on the difference between the $84,924 payment due and the $52,149.70 payment received, which is a difference of $32,774.30 at a rate of 5.25% from April 16, 2015, until the date declaratory judgment is entered. Thereafter, judgment interest would accrue per statute.

e. Plaintiff shall have a monetary judgment against the Defendant for $32,774.30, along with pre-judgement interest as set forth above, for which execution may issue.

f. Plaintiff is entitled to future annual payments of $84,924 payable for nine (9) more years, with the next payment being due on July 2, 2015, and July 2nd of each year thereafter.

g. In the event payment is not made by the Defendant on July 2nd of each year, and if the Plaintiff files an affidavit with the Court to that effect

-10-

after the due date, that the Plaintiff shall be allowed to submit a monetary judgment with his affidavit for that year's annual payment plus statutory interest for the time that the same is not paid and the Court will grant judgment for which execution may issue.

2. Final Judgment is entered in favor of Defendants, Green Bankshares, Inc. and GreenBank on Counts 1, III, and IV of the Amended Complaint, consistent with the Court's August 20, 2014 Order.

3. The costs associated with this cause are taxed to Defendants, Green Bankshares, Inc. and GreenBank.

Greenbank timely appealed to this Court.

## **Discussion**

Although not stated exactly as such, Greenbank raises three issues on appeal: 1) whether TARP regulations limit Vaught's deferred compensation to $52,149.70 each year for 10 years rather than $84,924; 2) whether FDIC golden parachute provisions limit deferred compensation benefits to amounts actually accrued on the books; and, 3) whether the Trial Court erred in excluding a May 28, 2014 opinion letter from an FDIC representative to Greenbank's counsel in which the FDIC representative supported Greenbank's stance as to Vaught's deferred compensation, on the basis that the letter was inadmissible hearsay. Vaught raises his own issue of whether Greenbank's appeal is frivolous. FDIC, in an *amicus curiae* brief, raises the additional issues of whether this Court even has subject matter jurisdiction and whether Vaught's only recourse is through the APA and federal court.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

This appeal requires an examination of federal regulations. Golden parachute means: "The term "golden parachute payment" means any payment to a senior executive officer for departure from a company for any reason, except for payments for services performed or benefits accrued." 12 U.S.C. § 5221(a)(2). Federal regulations prohibit the payment of golden parachutes under a variety of circumstances. Deferred compensation plans may be excluded from the golden parachute prohibitions as follows:

-11-

(4) Payments from benefit plans and deferred compensation plans. A payment from a benefit plan or a deferred compensation plan is treated as a payment for services performed or benefits accrued only if the following conditions are met:

(i) The plan was in effect at least one year prior to the employee's departure;

(ii) The payment is made pursuant to the plan and is made in accordance with the terms of the plan as in effect no later than one year before the departure and in accordance with any amendments to the plan during this one year period that do not increase the benefits payable hereunder;

(iii) The employee has a vested right, as defined under the applicable plan document, at the time of the departure or the change in control event (but not due to the departure or the change in control event) to the payments under the plan;

(iv) Benefits under the plan are accrued each period only for current or prior service rendered to the TARP recipient (except that an appropriate allowance may be made for service for a predecessor employer);

(v) Any payment made pursuant to the plan is not based on any discretionary acceleration of vesting or accrual of benefits which occurs at any time later than one year before the departure or the change in control event; and

(vi) With respect to payments under a deferred compensation plan, the TARP recipient has previously recognized compensation expense and accrued a liability for the benefit payments according to GAAP or segregated or otherwise set aside assets in a trust which may only be used to pay plan benefits, except that the assets of this trust may be available to satisfy claims of the TARP recipient's creditors in the case of insolvency and payments pursuant to the plan are not in excess of the accrued liability computed in accordance with GAAP.

31 C.F.R §30.1.

Seven requirements must be met in order for a plan to fulfill the definition of a deferred compensation plan, as follows:

-12-

(3) In the case of any nonqualified deferred compensation or supplemental retirement plans as described in paragraphs (d)(1) and (2) of this section, the following requirements shall apply:

(i) The plan was in effect at least one year prior to any of the events described in paragraph (f)(1)(ii) of this section;

(ii) Any payment made pursuant to such plan is made in accordance with the terms of the plan as in effect no later than one year prior to any of the events described in paragraph (f)(1)(ii) of this section and in accordance with any amendments to such plan during such one year period that do not increase the benefits payable thereunder;

(iii) The IAP has a vested right, as defined under the applicable plan document, at the time of termination of employment to payments under such plan;

(iv) Benefits under such plan are accrued each period only for current or prior service rendered to the employer (except that an allowance may be made for service with a predecessor employer);

(v) Any payment made pursuant to such plan is not based on any discretionary acceleration of vesting or accrual of benefits which occurs at any time later than one year prior to any of the events described in paragraph (f)(1)(ii) of this section;

(vi) The insured depository institution or depository institution holding company has previously recognized compensation expense and accrued a liability for the benefit payments according to GAAP or segregated or otherwise set aside assets in a trust which may only be used to pay plan benefits, except that the assets of such trust may be available to satisfy claims of the institution's or holding company's creditors in the case of insolvency; and

(vii) Payments pursuant to such plans shall not be in excess of the accrued liability computed in accordance with GAAP.

12 C.F.R. § 359.1(d)(3).

We first must establish whether this Court has subject matter jurisdiction. Our Supreme Court held that state courts' jurisdiction had been preempted in the *Wiggins* case, stating as follows in a case concerning the National Labor Relations Board:

> There is no question made in the present case as to the identity of issues or of the parties in the respective state and federal proceedings, except to the extent that the landowner, Wiggins and Company, was found not guilty of unfair labor practices in the N.L.R.B. case. It is not insisted, however, that this fact should affect our disposition of the state court proceedings or that Wiggins alone would be entitled to maintain in force an injunction against the union. As noted previously, the property was under a commercial lease and the premises were occupied in their entirety by Kresge and Giant Foods. There were no other tenants in the shopping center.

> It is the principal insistence of appellees that this Court should either withhold its decision until the Court of Appeals for the Sixth Circuit takes final action upon review of the N.L.R.B. order or, in the alternative, that this Court should leave in force the injunction ordered by the state Court of Appeals until the federal appellate court acts. We find no merit in this position. Once the Court of Appeals for the Sixth Circuit acts, it would still be possible for appellees to seek review in the Supreme Court of the United States. If appellees' contention had merit, the state courts might well leave an injunction in force until the Supreme Court of the United States had completed certiorari review.

> We do not so understand the pre-emption doctrine. As a result of the action of the state Court of Appeals, the Union has been enjoined from doing the very acts which the N.L.R.B. expressly authorized it to do. Appellees, on the other hand, are entitled to prohibit picketing under the state court order while they are required to permit it and to post notices to that effect under the order of the federal agency. Each of the parties is subject to cross-injunctions which are diametrically conflicting.

> Appellee insists that the action of the N.L.R.B. is erroneous and not in accord with previous decisions of the federal courts. It insists that the action may well be reversed, noting that in the majority opinion in the *Sears* case, *supra*, it was stated that trespassory picketing has seldom been held to be a protected activity.

-14-

However this may be, that argument goes to the merits, or lack thereof, of the N.L.R.B. decision, not to the question of state court jurisdiction. We have already noted that the Court of Appeals for the Sixth Circuit denied a stay of the N.L.R.B. order pending review. The issue of whether the order should or should not be stayed until the federal appellate court renders its decision is a matter for determination by the federal, not the state, courts.

The judgment of the Court of Appeals is reversed and the cause is dismissed because jurisdiction of the state courts has been pre-empted. Costs will be taxed to appellees.

*Wiggins and Co., Inc. v. Retail Clerks Union Local No. 1557, AFL-CIO*, 595 S.W.2d 802, 804-05 (Tenn. 1980).

In the *Hampton Roads Bankshares, Inc.* case, the Supreme Court of Virginia addressed whether TARP regulations prohibiting golden parachutes constituted a taking without compensation:

Harvard filed an action for the breach of a private contract. In response, HRB asserted EESA § 111 and the June Rule as an affirmative defense. To avoid HRB's defense, Harvard alleged that EESA § 111 and the June Rule effected an unconstitutional taking without just compensation. Certainly, we have jurisdiction over the breach of contract action, and we can apply federal law if necessary to resolve the dispute. *See Merrell Dow Pharm., Inc. v. Thompson*, 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986) (the existence of a federal statutory defense generally does not create federal subject matter jurisdiction). Indeed, the United States District Court for the Eastern District of Virginia dismissed HRB's prior action for declaratory judgment because the case turned on a question of Virginia contract law, and the "mere fact that TARP is implicated" was insufficient to support the exercise of federal jurisdiction. *Shore Bank v. Harvard*, 934 F.Supp.2d 827, 841 (E.D. Va. 2013). Although the dispute comes to us in a different posture, it still turns on a question of Virginia contract law, and we will resolve it accordingly.

\*\*\*

Harvard attempted to mount a collateral attack on the constitutionality of EESA § 111, as amended by the June Rule. But the validity of the law rendering performance impossible does not affect the validity of the

defense, provided the promisor relies upon the law in good faith. *See White v. J.M. Brown Amusement Co.*, 360 S.C. 366, 601 S.E.2d 342, 345-46 (2004) (holding that subsequent invalidation of a law did not revive a contract after the parties had ceased performing in good faith compliance with the law); *Gaunt v. Shelter Mut. Ins. Co.*, 808 S.W.2d 401 (Mo. Ct. App. 1991) (holding that the respondent did not breach a settlement agreement by making payment pursuant to a lien that was subsequently declared invalid); *Directions, Inc. v. New Prince Concrete Constr. Co.*, 200 N.J. Super. 639, 491 A.2d 1347 (Ct. App. Div. 1985) (concluding that the appellant was not required to challenge an apparently valid administrative order to determine its validity before refusing to perform a contract).

There is nothing in the record that would suggest HRB refused to make the golden parachute payment in bad faith. After Harvard terminated his employment, HRB sought guidance from Treasury regarding its contractual obligation to make the disputed golden parachute payment, and whether it could perform that obligation in light of EESA § 111, as implemented by the June Rule. In response, Treasury provided informal guidance indicating that HRB could not make the payment and comply with EESA § 111. Where, as here, the government has clearly expressed its intent to enforce the law, and the promisor cannot in good faith perform its contractual obligation without violating the law, the promisor is discharged from its obligation. *See Harriscom Svenska v. Harris Corp.*, 3 F.3d 576 (2d Cir. 1993) (finding that, in light of evidence that the government would not allow continued sales, the seller complied in good faith with the government's requirements and refused to perform its remaining obligations); Restatement (Second) of Contracts § 264 cmt. b.

\*\*\*

For these reasons, the circuit court erred when it ordered HRB to make the golden parachute payment despite the federal prohibition on such payments found in EESA § 111, and as implemented by the June Rule.

*Hampton Roads Bankshares, Inc. v. Harvard*, 291 Va. 42, 781 S.E.2d 172, 177, 179-80 (2016) (Footnotes omitted).

Our review of *Wiggins* and *Hampton Roads Bankshares, Inc.* persuades us that the Trial Court, and this Court, have subject matter jurisdiction to hear the present case. Unlike *Wiggins*, we are not dealing with the body of law stemming from the National Labor Relations Act. Administrative procedures already had been undertaken in

-16-

*Wiggins*, as well. In addition, *Hampton Roads Bankshares, Inc.* sustains the proposition that, among other things, TARP's mere implication does not require exclusive federal subject matter jurisdiction.

While our jurisdiction is not preempted, a separate question exists as to what deference, if any, Tennessee courts are to extend to FDIC's interpretation of its regulations. According to Vaught, the FDIC opinion letter dated May 28, 2014 which takes the position that Vaught is not entitled to the additional deferred compensation payments is merely an informal advisory opinion which is binding on no one. Vaught asserts that the Trial Court correctly ruled that the letter was inadmissible hearsay.

Relevant case law suggests, however, that the issue of the FDIC's interpretation and resulting stance does not begin or end with the question of whether the letter was properly excluded as hearsay.[2] In articulating a deferential standard to be applied when an agency interprets its own regulations, the United States Supreme Court provided:

> In the absence of any unambiguous statute or regulation, we turn to the FCC's interpretation of its regulations in its *amicus* brief. See, *e.g., Chase Bank USA, N.A. v. McCoy*, 562 U.S. ——, ——, 131 S.Ct. 871, 880, 178 L.Ed.2d 716 (2011). As we reaffirmed earlier this Term, we defer to an agency's interpretation of its regulations, even in a legal brief, unless the interpretation is " 'plainly erroneous or inconsistent with the regulation [s]' " or there is any other " 'reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.' " *Id*., at ——, ——, 131 S.Ct., at 880, 881 (quoting *Auer v. Robbins*, 519 U.S. 452, 461, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997)).

*Talk Am., Inc. v. Mich. Bell Tel. Co.*, 564 U.S. 50, 131 S. Ct. 2254, 2260-61, 180 L.Ed.2d 96 (2011).

In the present case, Greenbank received a letter from an FDIC representative opining that Vaught must not be paid the excess deferred compensation, lest this additional amount constitute a prohibited golden parachute. Moreover, FDIC appeared at oral arguments, and submitted an *amicus curiae* brief adopting a position contrary to Vaught's. If Vaught's argument is to be accepted, then we would be constrained to ignore FDIC's position on a question that involves that agency and its regulations. This Court declines to take such a view. Even if the FDIC letter was

---

[2] We believe the FDIC letter was not hearsay. The FDIC letter was offered to prove FDIC's opinion on the matter at issue, not that FDIC's opinion was correct. However, as we explain herein, the issue of the letter's admissibility is moot.

inadmissible hearsay, we know now by this point in the case unequivocally what FDIC's position is. The issue of the admissibility of the FDIC letter as evidence that the contested payments constitute an impermissible golden parachute is therefore moot. As the United States Supreme Court stated in *Talk America*, our deference to an agency's interpretation of its regulations can be based on the "agency's interpretation of its regulations, even in a legal brief . . . ." *Id.*

Deference, however, does not amount to abdication of a court's duty to review. We still must determine whether the agency's interpretation is plainly erroneous or inconsistent with the regulations, or, whether the interpretation reflects the agency's fairly considered judgment. As to the latter analysis, FDIC's consistent and persistent position in this case leaves us with no serious doubt as to whether that agency has taken a carefully considered judgment on the present case. With respect to whether that interpretation is plainly erroneous, or inconsistent with the regulations, Vaught advances a number of arguments as to why FDIC's interpretation is entitled to no deference. Among other things, Vaught points to testimony at trial supporting his position that the deferred compensation was an accrued liability, and not "vested." This is a critical distinction according to Vaught, which takes into account the "the time value of money." In other words, $521,497 was the present value in 2011 of the originally contemplated $849,240 total amount in deferred compensation, and the latter figure is therefore not excessive but part and parcel of what Vaught was entitled to all along. Vaught also notes the inconsistency in Greenbank having previously approved his deferred compensation package before reversing course.

While Vaught's position regarding accounting principles, trial testimony, and the time value of his deferred compensation is not illogical, we disagree with his implicit characterization of the issue confronting this Court on appeal. We perceive the issue before us to be a legal issue, rooted in TARP and the applicable regulations. This Court has found no case law, or indeed regulation, that unambiguously resolves a scenario like that of the present case. FDIC presents the following argument in its *amicus* brief:

> First, under 12 C.F.R. § 359.1(d)(3)(vii), payments due to Mr. Vaught cannot exceed the accrued liability computed under GAAP. As reflected in Schedule A, there is no dispute that the Accrued Liability, determined under GAAP, as of 2011 was $521,497. Therefore, as of the date of termination, the Bank had no further obligation to continue to accrue a liability in order to commence payments as of 2014; and whether it did or not is irrelevant. Second, the court's interpretation of 12 C.F.R. § 359.1(d)(3)(vii)—accrual under GAAP—is inconsistent with the parties' agreement that the deferred compensation meet the requirements of 12

-18-

C.F.R. § 359.1(d)(3)(iii)—vesting. 12 C.F.R. § 359.1(d)(3)(iii) provides that the IAP must have "a vested right, as defined under the applicable plan document, *at the time of termination of employment* to benefits under such plan." Schedule A expressly provides that as of 2011 that Mr. Vaught was 100 percent invested in $521,497, the amount of the Accrued Liability—not $849,240.

(Footnote omitted, emphasis in original). We find FDIC's interpretation of the regulations to be a reasonable one, and hold that it is entitled to deference.

Greenbank has been placed in an untenable position. It either must comply with the Trial Court's judgment, or flout FDIC and federal regulations which could expose Greenbank to serious legal penalties. Having advanced a reasonable interpretation of applicable regulations, FDIC's interpretation requires the courts' initial deference. The judgment of the Trial Court is vacated, and this case is remanded.

FDIC argues in its *amicus* brief that "Mr. Vaught does have a remedy, however." Vaught may yet pursue relief in federal court through the APA, where he may challenge the FDIC's interpretation of the applicable regulations if he elects to do so. We agree that Vaught should be given the opportunity to do so. Therefore, we order a 60 day stay in this case while on remand in the Trial Court to allow Vaught to pursue such other avenues of relief as are available to him, including filing a lawsuit against FDIC under the APA, should he so choose. Should Vaught elect not to pursue these other potential avenues of relief within the 60 day stay, the Trial Court is instructed to enter judgment in favor of Greenbank. This would leave Vaught with a judgment to receive the deferred compensation payments totaling $521,497, the amount all parties agree he is entitled to receive. All other issues raised on appeal are pretermitted.

## Conclusion

The judgment of the Trial Court is vacated, and this cause is remanded to the Trial Court for further proceedings consistent with this opinion and for collection of the costs below. The costs on appeal are assessed against the Appellee, Kenneth R. Vaught.

_____
D. MICHAEL SWINEY, CHIEF JUDGE